15-1040 15-1193 Lous Transport Inc v. NLRB 15 minutes per side for Petitioners Cross Respondents Amy Comito Good morning. May it please the Court. Good morning and Happy St. Patrick's Day. My name is Amy Comito and I am here this morning on behalf of the Petitioners Lous Transport and TKMS. For purposes of simplicity, I will simply refer to the Petitioners as Lous if that's okay. And I have requested two minutes of rebuttal. In this matter, the National Labor Relations Board failed to make two necessary determinations and in failing to do so, the Board erred in its findings and conclusions. Application of the legal standard established by this circuit demonstrates that Lous' termination of Mr. Hershey was lawful and that the Board's decision and order should not be upheld because it has no reasonable basis in law. The two central issues, neither of which were addressed or decided by the Board, are first of all whether or not Mr. Hershey's display of the signs constituted protected concerted activity and secondly, even if they were protected concerted activity, whether or not Lous knew that the signs were such. Mr. Comito, let me suggest an alternative way to look at this before you launch right into the signs. It seems to me that the weakest part of your case deals not with the signs but rather with the radio conversation. And if I understand it right, and I may not say this exactly correctly, but I don't think that you accepted to the question of whether the radio conversation was protected activity. So it comes down then to the question of was he fired for engaging in that and you didn't accept to the question of whether they knew it was protected activity. So it comes down, I think, in that part of the case to simply whether the substantial evidence that in fact that was the reason for firing him or one of the two reasons for firing him. And it's hard to see how there isn't substantial evidence when you look at the actual comments of the Lemming, is that their names? Lemming. Lemming. When you look at the comments of the two Lemming brothers, they almost seemingly admitted it. So if any of the things that I've just said, or I guess all of them, are correct, we never even get to the signs. I would love to address those issues, Judge McKeague. Actually, first of all, we did not accept to any findings of knowledge because there were no findings of knowledge, and that's one of the errors. The board used a belief standard, and under this circuit's established law, a belief is not sufficient. The Manamart case, the Meyer case, and several other cases in this circuit say that knowledge is a required element. I knew these two guys were talking about working conditions. They're complaining about working conditions. That clearly seems to be, under the board authority, concerted action. Well, if you look at the testimony, Judge, of Mr. Lemming, David Lemming in particular, he's the one who overheard the conversation. His testimony at the hearing, his concern wasn't with the complaints about the trucks and the quarry roads. They knew it was terrible working conditions. They heard every driver every single day complain about it. Mr. Lemming's beef with that conversation was when he called one of the owners, Mr. Israel, an effing cheapskate, another name I'm not comfortable saying, and he dropped what they called F-bombs throughout the conversation. That was his concern with respect to the radio conversation, the inappropriate language, the offensive language, and the comments made about the owner. But the fact that that was his concern doesn't mean that anybody wouldn't know it was concerted activity. And if it was concerted activity and he knew it and he fired him because of it, he loses. So he might have been also upset about the names they're calling him and the violation of the no chatter rule and all that, but I don't see how that distracts from the essential underlying legal question here. Well, I have two responses to that. First of all, we don't still lose because under the right line analysis, which is a board decision that's reiterated in this circuit in multiple cases, even if one of the reasons was the radio conversation for his termination, say that the court agrees that that was one of the reasons or believes that was one of the reasons, if we can then, we being lose, can then affirmatively defend by showing that he still would have been fired on March 27th due to unprotected activity, the unprotected activity being the signs, and that's why it was starting with the signs not even being protected activity. So but for the signs, he would not have been fired on March 27th, regardless of whether or not he engaged in activity on January 7th, and that is the law in this circuit. Let me ask you one other follow-up question. Isn't there a difference between whether he was fired for protected activity involving the signs, of which there is a contested issue, or whether he was, if the firing for the radio conversation was accompanied by the firing for the signs, it doesn't mean that necessarily they believed that the signs were concerted activity or protected activity, I get that point, but what they said was we warned him, don't do this again, and they thought he did it again with respect to the signs, irrespective of whether that was protected activity. So I agree that they probably fired him for the combination of those two things, but if one was protected activity, they don't get a pass under the labor laws for that. And it's our position certainly though that while the radio incident was mentioned, it wasn't the complaints about the roads and the trucks. It was the mocking of the company and its owner and the inappropriate language and the inappropriate manner in which he did it. Like I said, they heard the complaints all the time. That wasn't a newsflash to them, and that didn't bother them. It was the way he went about it that they felt was inappropriate, and that was their reference to the radio conversation. He certainly wasn't fired on January 27th or January 7th or 8th. Actually, the owner told management not to fire him. He said talk to him, turn it into a positive experience. Drivers are hard to keep. He not only was not terminated, he was offered another position within the quarry because he was clearly unhappy, but he declined the position that was offered to him because he wanted to continue to make more money. He apologized on January 8th. He said he was just blowing off some steam, and Mr. Lamming's testimony was that he believed the apology to be sincere. He believed that they were moving forward and that this was behind them, and that was unrefuted testimony. So a mention on March 27th of the radio conversation back on January 7th was really about the mocking and offensive nature of the conversation, not about the complaints about the working conditions. Did you have any other questions for me, or should I continue? You should continue. Thank you. The signs were not protected concerted activity. The relevant question in determining whether or not an employee's activity is protected is whether the employee acted with the purpose of furthering group goals. I do have one other question. I was looking in my notes for whatever I could find that relates to your point that if you're actually fired for some other reason, in whole or in part, that sort of shields the violation of the act in connection with the protected activity. But it seems to me that based on the case law, the law is that if the discharge was motivated in part by the protected activity, then you violate Section 8A.1. Is that contrary to your understanding of the law? If the discharge is motivated in part by the collected activity, by the protected activity, you lose. There has to be the nexus between a discriminatory motive and the termination. Correct. And in part satisfies it. So if we find that the speech over the radio was protected activity and if he was fired in part for that, you lose. And we don't get to the signs. Is that right or wrong? And we knew that it was protected activity. When you're agreeing to that, which part of the conversation are we talking about? Not the griping about the roads, but impugning the management personally. That was what management took issue with, were the comments about the owner. Mr. Lambing's testimony was not at all focused on the complaints about the road. So when he reprimanded him for that conversation, he didn't reprimand him for complaining about the roads. He reprimanded him for talking about Mr. Israel over the radio as he did and using the language that he used. That's why he was reprimanded. Well, let's stop with the knowledge component then because that was what your answer was to my last question, right? Correct. I believe, so correct me if this is wrong, that you didn't argue before the board the question of whether they had knowledge that the radio conversation was protected activity. So we have some things you didn't argue. That seems to be fitting in that category. And then other things you didn't accept from the conclusion that the board drew. That's the question of was it really protected activity. So if it's correct, you might have a good argument, but if you didn't make it before the board, you can't make it before us. We did not file exceptions with respect to whether or not the radio conversation was protected activity. We did certainly take exception and argue the fact that that was not one of the reasons he was terminated. But did you take exception or argue before the board that the knowledge argument that you're making now with respect to the radio conversation, that they didn't know that it was protected activity? Not until the board came back and used the word belief. The board is the one that applied the wrong standard, and then we argued the correct standard here. The board, in its decision and order, used the wrong legal standard in its decision and order. So you did argue there was no knowledge of the protected nature of the radio conversation activity before the board, or you didn't argue that? We didn't specifically argue knowledge versus belief. And you don't think that's a problem? I think the problem is with the board using the wrong standard in its decision, and using cases from other circuits, and using board decisions which run contrary to the decisions of this circuit. Mr. Hershey's own testimony with respect to the signs was that all he cared about was that they make the drivers laugh. And all driver testimony regarding the reaction to the signs was that they just thought they were funny. So Hershey's own testimony supports a finding that the signs were not protected concerted activity. And because the board applied the wrong legal standard, there is no reasonable basis in law for its holding and its decision, and we ask that the order not be enforced. Thank you. Thank you. You have reserved some time, so let's hear from the other side. Thank you. May it please the court. Good morning. My name is Valerie Collins, and I represent the National Labor Relations Board. The primary issue before the court. Should we start with the standard? Absolutely. What's your argument to respond to the board using the wrong standard? Oh, okay, I thought you meant the standard of review here. No. The board absolutely did not use the wrong standard here in either of its findings. I mean, there's two findings. Following Sixth Circuit precedent. Yes. So the company's main argument in that regard is that the board's alternative finding, which has to go to the company's belief in the protected nature of the signs. So the company is arguing that because this court in Meyer held that in order for there to be a violation of 8A1, one, the board is required to show protected concerted activity and then to show that the employer knew about it. The court in Meyer did not address the situation that we're faced with here today, whether belief is sufficient to satisfy the motivation aspect of 8A1. And it's our understanding that the company's interpretation of Meyer is quite restricted, and it doesn't take a lot to come to that conclusion because if you read Meyer. You're agreeing with the company's interpretation? No. I'm agreeing that that is. I mean, you said it doesn't take much to come to that conclusion, so it sounds like agreement. No. I misspoke. I'm saying we do not agree with the company's interpretation of Meyer as it applies to this case. Essentially, it doesn't. This issue wasn't before the court in Meyer. It is true that one way the board can show improper motivation is to show protected concerted activity and knowledge. That's one way. Another way, and we think this is completely consistent with Meyer, is to show that the employer had a belief that the person was engaged in protected concerted activity. And if you look at Meyer, the whole rationale behind the decision, essentially what the board did is the board, and this is in Meyer, the board said you don't have to have a subjective element under 8A1 violations. It just has to reasonably have a tendency to coerce. And what this circuit said is no. You have to show something subjective because based on the language of 8A1, the unlawful action has to be because of something. So there has to be a subjective aspect to the test. And that's why the court decided that you needed to show knowledge in protected concerted activity. Here, the subjective part or that subjective component is met fully because it's so clear that the company believed he was engaged in protected concerted activity. So the board never even... About the argument that he was, are we speaking primarily about the signs? Yes, this is concerning the signs. And then so you've heard the argument that it was to entertain, that the gentleman's own, that it was to be funny, not really to comment. So what do you think about that? Honestly, I think that's irrelevant. The board didn't hold that the signs were protected concerted activity. There's no finding on that to review before this court because the board came to the conclusion that they didn't even need to deal with that. Even if, and again, this isn't before the court, but even if the board did hold that it was protected concerted activity, there's certainly no rule that I'm aware of that you can't be funny or attempt to be funny while you're engaged in concerted activity and while you are trying to improve the morale of your fellow drivers who have all complained about these safety concerns. And I think that, I mean, we're kind of talking... Let me ask the question in this way. This is troubling me in reading this. In terms of a knowledge component, first of all, the employer has to know what the employee is doing, that they actually were doing something that might be or might not be concerted activity or protected activity. Do you agree with that? Can you repeat that? That they have to know... If we take this a step at a time, there could be cases where the employer didn't even know what the employee was doing that later was claimed to be protected activity. That's the leafleting in the parking lot and the guy gets there too late to see that. Yes. Assuming that they knew what the activity was, then we get to the question of whether you know that that activity was, in fact, protected activity. Now, you do this all the time, so we just see these cases every now and then. So I'm just curious, as a general rule,  to evidence an employer's knowledge that the activity they knew about was, in fact, legally protected activity. Well, in a typical case, the board will apply a right-line analysis. Opposing counsel mentioned right-line. That's kind of the framework that the board uses to analyze when you have essentially kind of competing motives. So where the general counsel is arguing that the company terminated or disciplined someone for a protected reason and the company is saying, no, it was completely legit. We disciplined this guy because he's late all of the time or something like that. And so what the board will go through is this analysis where the general counsel has to show that there's a motivating factor, which kind of goes to your earlier statements. It doesn't have to be the only one. It doesn't have to be the predominant one. If there's a motivating factor that is unlawful under the act, the company then has to show that it would have fired this person regardless of their protected concerted activity. I don't understand how that addresses my question, which is how do you prove knowledge when it is required that the activity was, in fact, protected activity? So under right-line, within the first step, the general counsel has to show that there is animus, and that goes to the knowledge because you can't have animus for protected activity if you don't know about it. So that's where that usually fits in. Here, this case is kind of unusual because the motives are very clear. The company gave two very clear reasons why Mr. Hershey was fired. So there wasn't a whole lot of analysis that the board needed to do to kind of uncover what the motives were. But again, there can be animus against the employee, in this case for bad-mouthing the company and calling them names. That doesn't establish animus with respect to the nature of the activities, i.e., a concerted action that's protected activity. Yes. In a typical situation, the company would then argue, this had nothing to do with the protected activity. We fired this person because we were tired of looking at them every day or whatever legitimate reason that they have. Here, it's so clear. There are only two reasons. The company's own witnesses gave two reasons, the signs and the radio conversation. Essentially, what the company is asking this court to do is not look at the plain meaning of their own testimony. The two Lamming brothers made it abundantly clear it was the signs and the radio. They say and. They say also. They say that the activity was continuing. The protected nature of the radio conversation is absolutely uncontested before this court. So the court doesn't have to decide whether the radio conversation was protected concerted activity. It was. You also have prior violations that is not contested before this court. So when the company threatened Hershey and Pledger because of that radio conversation, that was unlawful. It was right around this time. If you look at the context, because we're kind of looking at it very specifically, like there's this radio conversation, and then two months later, there are these signs that came out of nowhere. What the testimony shows is that this was all around the same time. He started putting these signs in his truck shortly after that radio conversation. In February, the workers were so concerned with the safety of their safety at this work site that they organized a work stoppage. Each and every driver, all of them, I think there were 19 or 20, complained to the company about their safety concerns, about the roads and the trucks. Two days before he was terminated, there was a meeting where the company was addressing some of these safety concerns, and he's vocal in complaining. And then two days later, the company discovered, and it's unclear how, not that the signs existed, but the fact that people and other drivers were talking about the signs. The signs themselves weren't the problem. The problem or the concern of the company was the fact that he was getting everybody all riled up and upset about these safety concerns. So it really shows a history of everyone. I mean, these were clearly group concerns. Everyone was complaining about them. The radio conversation where he's talking about these safety concerns was clearly protected and in any event isn't before the court. The testimony is very clear. The fact that it was protected activity because it wasn't accepted to or wasn't argued before the board still doesn't address itself to the question of whether they knew, i.e. knowledge, that the activity of which they were aware was in fact legally protected activity. And I think that... So I have two answers to your concern. Primarily, that issue isn't before the court. The company is prohibited by 10E of the Act from raising that. It did not raise this concern to the court in regards to the radio conversation. The company argues that it couldn't have because the board was the first one to kind of bring that element in. Under Sixth Circuit law, the company is required to file a motion for reconsideration before the board so the board can consider its argument. It simply cannot... So there's a procedural avenue. There are. Ms. Comito's response to my question was that didn't come up until the board applied the wrong standard. Yes. So at that point, if they want to contest that, you're saying they have to ask for reconsideration. Absolutely. And what is that rule again? I believe it's in our brief. It's in the section of our brief. I don't have the site off the top of my head. That's fine. But it's clear that they should have requested a motion for reconsideration. And the policy there is... Regarding the standard, the applied belief standard. Or the fact that the argument that the board incorrectly didn't make a finding of knowledge in regard to the radio conversation. That simply wasn't argued before the board. And it's improper to argue that now before the court for the first time because the board essentially never got a crack at it, so to say. And so that's not before the court. But in terms of the belief, I definitely wanted to highlight to this court some of the language that the Lamming brothers used. For example, Jeffrey Lamming characterized these signs as visual chatter that were stirring up the crowd, getting people going, getting people riled up, bad-mouthing the company, still talking bad, talking derogatory. Notably, the bad-mouthing the company comment, he used that same exact language to describe the radio conversation, which is not before the court because that's protected. And essentially what the company is arguing is saying, oh, no, no, that's not what they meant. They meant something else. That's not enough. Simply because there's a possibility that there's another plausible way to read this testimony is not sufficient to not enforce a board order. It's abundantly clear that here substantial evidence supports the conclusion that they believed he was stirring up the crowd. People, when they're talking about protected concerted activity, it would be strange for regular people to use that language. You don't go around talking, oh, my employees are really getting on my nerves because they're engaged in protected concerted activity. People say code language just like this. It's almost textbook in describing this type of behavior, and this is the language that they used. I do want to point out that in the company's reply brief, they spend quite a bit of time claiming that the board has mischaracterized the record and misled this court. I absolutely invite the court to look at that testimony. It's not a lot. It's abundantly clear. I'm the one who wrote the brief, so when I saw that I was definitely a little surprised. And I think one more thing I wanted to mention, which is noteworthy, is before the board, the company never claimed that his activity in either one of these situations, the radio or the signs, was so egregious that that's the reason why he shouldn't be protected under the act. That was not a claim made before the board. The testimony makes clear that wasn't an issue before the board. It wasn't the fact that a couple of these signs were definitely questionable. What the company was upset about was the very nature of these signs, the message that they were sending to the other employees and the fact that they were getting everybody all riled up and stirring up trouble or whatnot. If the court does not have further questions for me, I would ask that this court enforce the board's order in full because substantial evidence supports the finding that Michael Hershey was unlawfully discharged. Thank you. Thank you. Thanks, counsel. Ms. Comito. Thank you. Just a couple of brief points. Under the law in this circuit, Meijer is applicable. Knowledge is required. Knowledge with respect to the signs and knowledge with respect to the radio. And again, if this court were to look back at the testimony... Am I not right, though, that Meijer in and of itself says knowledge won't always be an issue? Knowledge of the protected or concerted nature of the activity is certainly an issue. We knew there were signs at some point, but there was no evidence or testimony that we were aware of the specific contents of the signs until March 27th. If you know about what the activity was, i.e., the nature of the conversation or the nature of the signs, surely under the Act, somebody can't be willfully ignorant of labor law to simply say, I'm the dumb employer. I didn't know that that was protected activity. I think, especially with respect to the radio incident, that they weren't playing the dumb employer at all. As I previously stated, the quarry conditions and the truck conditions, they knew that they were bad. They heard it from every driver every day. Both sides presented testimony to that effect. That's not what bothered them about the radio. It was the offensive language over the radio and the names that they called Mr. Israel. That was their focus on the radio conversation, and certainly there's no substantial evidence that they had knowledge that that offensive language and those comments were protected activity, especially for these at-will employees. Do you want to say anything about the invitation to quit too? Because that's really the basis of the Board's ruling as to the phone conversation is, if I understand it right. Assuming it's protected activity, which you haven't accepted to, then inviting somebody to quit because of the protected activity is, in fact, a violation of the Act. I would be happy to address that. Mr. Lamming testified, and he tried to explain. It wasn't so much an invitation as he was trying to understand. It can't possibly be that bad. You're still here. They offered him another position. They didn't fire him. They actually were told not to fire him. So it wasn't an invitation. It was not a rhetorical question, but it was them trying to understand, if it's so bad, I don't understand why you're still here. Well, you did say, why are you still here? But then you followed it up. I said, if you have a problem, you need to find a different place to work. Isn't that an invitation to quit? And he offered him a different place to work in the same company. You can't do that. In the same company? You don't have to work in the quarry. The quarry was a voluntary job. It was a specific voluntary job. You think it's not a violation of the Act to offer to transfer somebody to a lower-paying job because of protected activity? No, I'm not saying that at all. My point is they were trying to make him happy. They didn't want to fire him. They didn't want him to quit. They were trying to make him happy. And by offering the job that would take him out of the quarry, that's what they were doing. Thanks, Counsel. We have your argument, Counsel, and we will consider your case carefully and issue an opinion in due course. Thank you. All right, we're ready for the next one.